Good morning, Your Honors, and may it please the Court. My name is Douglas Dionne, and with my co-counsels Evangeline Abriel and Taleen Manassian, we represent the petitioner, Mr. Pramesh Maharaj. This morning, Ms. Manassian will address the due process violations, and I will address the errors related to the Convention Against Torture claim. At this time, we'd like to reserve one minute of rebuttal, please. How are you dividing the time between you? I'm going to discuss the claims for five minutes, and then Ms. Manassian will address due process for four minutes, and then we'll reserve that minute for rebuttal. So we're going to be efficient for you, Your Honor. Okay. Okay. So turning to the CAT claim, Your Honors, we are here today because the ethnic turmoil that led to the petitioner's past torture is still a serious problem in Fiji, and therefore it is still more likely than not that he'll be tortured if he's forced to return. And the Board's decision to the contrary was erroneous in three ways. Turning to the Board's first error, Your Honor, the Board erred when it came to the conclusion that there had been improvements in Fiji's country conditions. Because this is an erroneous factual conclusion, it's just by the substantial evidence standard. And in support of the Board's conclusion, the Board cites to pages 8 and 9 of the IJ's decision, which can be found at 64 and 65 of the administrative record. At this point, when we – when the Court looks at this part of the IJ's decision, we see that there is a major disconnect between the IJ's description of the conditions in Fiji and the Board's impression that there had been improvements in Fiji. But why do you think he in particular will be subject to future tortures? Your Honor, Mr. Mataraj will be particularly subject to torture because of the nature of his past torture and the nature or the lack of changes in Fiji. It's been, what, 20 years since he was last tortured? Yes, Your Honor. So I'm just curious. I understand your argument. I've been thinking about this. And why do you think he in particular, if he goes back there, is going to be picked out of the mob, so to speak, or the mass of the population, and tortured? Your Honor, primarily because the factors that led to Mr. Mataraj's past torture are still present. When I say factors, I mean his personal circumstances. He was ethnicity. His ethnicity and also his political opinions. And so Mr. Mataraj was – will be singled out for torture because the governmental issues that led to his initial torture by the government and the ethnic tension that led to his torture by the native Fijians have not changed. Those situations – To mark man, so to speak? So to speak, yes, Your Honor. People that – Watching us now? I'm sorry? I mean, are they watching him now, wondering if he's going to go back or not? No, Your Honor. We do not mean to present the picture that the Fijian government is waiting at the ready for Mr. Mataraj to arrive. However, focusing on merely governmental interference is one of the problems with this case, because though perhaps Mr. Mataraj – though perhaps the government will be sitting at the ready, that says nothing about what the nongovernmental sources of torture may be – may be planning or may – may have in the works. And in Mr. Mataraj's particular case, when he is – when he did suffer torture, it was a slowly developing pattern, at least with respect to the native Fijians when he was tortured. It wasn't an instantaneous collision. The IJ described – certainly described the police actions, the military actions against Mr. Mataraj's torture, but described the actions by native Fijians. And this is a very troubled country. We've certainly seen a number of really very difficult cases from Fiji. But described it as harassment. I mean, this is throwing rocks and bottles and taunting and things like that. It doesn't quite arise to the level of torture. There is the problem that the police won't do anything about the harassment or burglaries or other things. But it doesn't seem to arrive to torture. And, Your Honor, in that way, the IJ erred by failing to properly consider the past torture in that the IJ dismissed Mr. Mataraj's treatment by native Fijians as harassment. And that was in part because he applied the incorrect definition of acquiescence. On page 65 of the record, we see that the IJ says, More than willful blindness is necessary. And in this situation, that led to the IJ's discounting of Mr. Mataraj's treatment by native Fijians. When he had his spleen removed and beat, that was by native Fijians, right? Yes, Your Honor. Inside a police station. And after he was stabbed by the native Fijians, the Fijian police arrived. He asked them to pursue his attackers because they were close by. And they explicitly told him that they do not have time to pursue an attacker because attacks like these on native Indo-Fijians happen all of the time. Counsel, even if we were inclined to adopt your argument, and it's a very careful argument, the problem with your client is he's been back to Fiji in the meantime. Correct, Your Honor. Voluntarily. And he was concerned for his safety while he was there, but he wasn't bothered. And nobody met him at the airport. And nobody went around looking for him. Yes, Your Honor. And the problem with your analysis of the return trips, which is also that of the IJ, is that the probative value of those return trips is undermined by the fact that they were brief return trips. They were for very important or very specific purposes. You have a fear of being tortured upon your return to a country. You don't go to that country. And he went back to the country voluntarily. And years later, he sent his wife back to the country. And neither one of them had problems during the time. That's not to say that if they go back that they're not going to be, you know, subjected to the GIAs, but it does suggest that they can return to Fiji without being tortured. Your Honor, however, the problem is that the quick nature of those return trips combined with the fact that when Mr. Maharaj has faced torture in the country, it has been a slowly developing process. I mean, that these return trips, while probative in some way, are not able to overwhelm the fact that the conditions in Fiji are still very negative. Thank you for your time. Is this the same wife, by the way? It's the same wife throughout? Correct. Yes, Your Honor. Okay. The same lady that he was there with initially, that he came back here, that he had problems with here, that he's – I don't know what's – she never submitted a letter. She was going to submit a letter. I don't – Yes, it's the same wife, Your Honor. Okay. Yes. And out of respect for my co-counsel, I turn over the podium. Thank you. Good morning, Your Honors, and may it please the Court to lean Manasian on behalf of Mr. Pramesh Maharaj. The IJ failed to act as a neutral arbiter by relying on information not found in the record. The BIA erred on appeal by failing to recognize the IJ's error. Today, I will focus on two instances of this due process violation. First, the IJ determined that Mr. Maharaj was an unwanted man in Fiji based on his speculations regarding a no-fly list. Second, the IJ assessed the case using his personal knowledge, which he failed to make part of the record. To my first example, Your Honors, this Court held in Maney that it is an error for the IJ to insert their speculation when assessing an asylum case. On page 174 of the record, the IJ concludes that because Mr. Maharaj was on a – not on a no-fly list, that this meant that the Fijian government was not looking for him. In reaching this conclusion, the IJ is speculating that the Fijian government is organized enough to put everyone that they're targeting on this list and then to effectively and efficiently check for this while people are entering through their country through customs. This speculation was prejudicial. On page 174 of the record, the IJ explicitly states that the fact that Mr. Maharaj was able to pass through customs twice without any government interference casts doubt as to whether Mr. Maharaj would actually be more likely than not to be tortured if returned. Then in the decision itself on pages 65 and 63 of the record, the IJ makes specific reference to Mr. Maharaj's passage through Fijian government hands through customs without any government interference while he is assessing his – Mr. Maharaj's deferral of removal claim. To my second example, Your Honors, the IJ assessed the case using his personal knowledge as a consular official, which he failed to make part of the record. In matter of SMJ, it was held that any evidence relied on by the IJ must be made part of the record, and yet on – Does all common sense have to be made part of the record as well? No, Your Honors. Not common sense, but in this particular – It was a pretty – it was a pretty straightforward question. What he was trying to get, and it appears that Mr. Maharaj may have been resistant to – to admitting it. It looks like the two of them just kept tussling back and forth over what the implications were. But Mr. Maharaj was not – was not willing to – the IJ couldn't seem to get a straight answer out of him as to whether he had asked a consular official for asylum in the United States. And he said, no, you can't – you can't get help from consular officials. At that point, the IJ says, wait a minute, I worked in an embassy for six years. If you tell them you've got problems, they will – they will address it. You didn't ask them that, did you? And finally, after a long back and forth, Mr. Maharaj finally says, no, I didn't ask them. What's – I – what's – what's outside of the record there? Your Honors, it's outside of the record because he states that he was an embassy official and that it was for six years and that because of – Do we have reason – do we have reason that we should doubt that or that he can't rely on his – on – on that experience? That just doesn't – his personal knowledge as an embassy official, he should have included more into the record, as was held in SMJ, more experience about not just the fact that you're an embassy official. That's not enough to – to help the court – to help Mr. Maharaj understand why that's even relevant to Maharaj's particular claim. He never stated the country that he was an embassy official in, the year he was an embassy official in, and how that even would be relevant to Mr. Maharaj, a native trying to flee from his country, and – and the fact that Mr. Maharaj didn't ask for help. We see in – in the decision itself that – that this could have actually affected Mr. – his assessment of Mr. Maharaj's past torture. I see that my time is closing, and so we ask that this Court reverse the BIA's decision and grant deferral of removal. Can I follow up? Yeah. Just a simple little question. Yeah. Your client's in – in custody detention right now. Yes, Your Honor. Does he – if he – does he have the ability to say, to heck with it, I'm going back and get out of detention? Do you know that? I mean, you may not know that. Yes, I believe that – that he could – the question is that he could return to Fiji on his own. Why don't he say, listen, I'm tired of being in – in this custody place. I'm going back to Fiji. He's not held there. He just is – he's – he just can't come back to the United States. He can go to Fiji right now if he wants to, right? He – yes, Your Honor. He can go to Fiji, but he is scared. He'd rather stay in the detention center. Exactly, because he – he – he is trying – he got asylum in the United States, and he feels like if he's returned to Fiji, he would be tortured. Thank you. I'm just curious about that. Okay. Thanks. We have taken you over your time. I will give you the minute that you asked for rebuttal. Okay. Thank you. We will hear from the government. Ms. Clay. Good morning. May it please the Court, Sharon Clay on behalf of the government. Ms. Clay, you may need to speak up just a little bit for us. I apologize. Sharon Clay on behalf of the government. The only issue before the immigration judge was whether or not Mr. Maharaj had met his burden of showing the likelihood of torture on his return home to the Fijian government. The immigration judge properly concluded that he would not suffer torture because he found evidence of – he took – wait a minute. I'm sorry. He considered the length of time that he has been – I apologize. The length of time that he's been away from the country, that there's no continuing interest on his behalf. The fact that he has traveled back to Fiji since his mistreatment, the consideration that his wife has traveled back is also a pertinent consideration. His wife's family remained in Fiji without harm, and they are native Indonesians, Indo-Fijians. I apologize. The immigration judge also looked to the background documents and state country reports and also found that although there is some evidence of torture currently existing in Fiji, based on an individualized analysis, Mr. Maharaj wouldn't be one of the persons who would be targeted for harm. Specifically, what the immigration judge found was that currently, while there is harassment and discrimination against persons who participated in the Fiji Labor Party, what he did find is that persecution tends to be attributed to persons who violate their new public emergency regulations or persons who are currently critical of the government. The interesting thing about this record is that the current regime, who is the regime that actually was responsible for the 2006 coup, there appears to be some information in the record that shows that it is a Indo-Fijian friendly regime, although they are engaged in human rights violations for critics and for journalists and censorship and assembly, there's no evidence in the record that anyone could see that an Indo-Fijian would be tortured upon their return, outside of being with the public emergency regulations. With regard to the bias and due process claims, the immigration judge has an obligation to develop the record. However, in doing his job, he has the obligation to interrogate, examine, and cross-examine the alien, especially in this case where he was previously found adversely credible. With regard to the remarks ---- Well, he was pretty ---- his behavior wasn't very good. Right. It could have been a little bit better. Yeah. But it wasn't bias. It was just a matter of trying to assess the underlying decision-making of the Petitioner in terms of ---- Well, it doesn't necessarily have to be biased if he interferes with Petitioner's ability to present his case. Am I right? That's correct. The law allows for the immigration judges to make opinions or form opinions based on the relevant facts and the proceedings. It only becomes a problem in a case when he exalts or has some sort of deep-seated favoritism which prevents him from making a fair judgment. If you look at the record, and I apologize for not identifying the pages, the immigration judge actually chastised the government's counsel for being argumentative in its cross-examination. There's also evidence in the record that shows that the immigration judge had repeatedly understood Mr. Maharaj's fear of returning to Indonesia ---- I mean, to Fiji. There's also evidence in the record when he was having that banter back and forth about his ---- whether or not he would have went into a mob of people outside or thrown rocks and bottles and have cut him. What you do find is that the immigration judge pulled back and honestly said that, well, you know what, maybe we are different, I'm just a chicken. Maybe somebody like you may be brave enough to do something like that, but I didn't. So I fear ---- I do not see where the immigration judge's opinions, remarks, comments exhibit any kind of bias. And to add to that whole argument, there's no evidence that the petitioner was prevented from having a full and fair hearing, and there's no evidence in the IJA's decision that shows that bias was evident. Did you say ---- I may have misheard you. Did you say that they did conduct an individualized analysis? Yes. The IJA, yes, he looked at the immigration's particular circumstances, that being his ethnic ---- his ethnicity, his race, and the fact that he was a Fiji labor party. So it's a general kind of an analysis opposed to an in ---- would you call it maybe that's ---- No. I would call it a ---- it was a ---- he looked at the specific harms, because it's so individualistic that actually there are evidence of ---- there is evidence of torture in the record. Because the IJA looked at the specifics, who was suffering the torture, he was able to do an individualized analysis and determine that Mr. Maharaj would not be one of those persons that would suffer the torture upon him. Even though he clearly was subject to torture in the past. In the past. But in the past. But his torture in the past does not give him a presumption of torture in the future. Others allegedly was killed. Do you believe that or not? Well, the evidence is inconclusive. And when you have the burden of proving beyond a clear ---- a clear probability of burden of proof, inconclusive evidence does not compel the conclusion that you're more likely than not to be tortured upon your return to your home country. I would like to leave one or two minutes for rebuttal. Counsel, you don't have an opportunity for rebuttal. You're ---- you're the bottom slide brief here. You're the appellee, not the appellant. Oh, I'm sorry. If there's anything further, you have 4 minutes. If you have anything further you'd like us to know, this is your 4 minutes to tell us. If not, you can submit. Submit it. Thank you. All right. I will give the Petitioners a minute for rebuttal. Thank you. Your Honors, on rebuttal, I would simply like to make one point about the Convention against Torture Claim and one point regarding the Due Process Claim. With respect to the Catt claim, Mr. Maharaj's demonstration of past torture triggered the Court's requirement to conduct an individualized analysis. In this, as this Court held in Ali v. Holder, general country conditions, though can be indicative, must be applied. How could they have conducted that? What more could we have done? What else did Mr. Maharaj fail to put into the record that would have suggested that he will be singled out by someone? Your Honor, the conditions described by the IJ on page 64 belie the lack of individualized determination. He mentions that torture is still being used on arrestees, as it had happened to Mr. Maharaj. What did Mr. Maharaj put in the record that the IJ failed to take account of that Mr. Maharaj will be singled out as opposed to simply be persecuted because he's an Indo-Fijian, just like all of the other thousands of Indo-Fijians in Fiji? Your Honor, I don't know that I can tell you exactly what he failed to put in the record, but the Board's requirement What did he try to put in the record? The fact that the current conditions, like the fact that, excuse me, the fact that arrestees are still being tortured, and the only positive statements made by the IJ regarding But he's not subject to arrest. He's not wanted for anything. The government's not looking for him. He was not subject to arrest in the first place, but yet he was arrested for no reason and never charged with a crime. And that situation with the impunity that the current regime has given to their security forces persists to this day. And the IJ's sole recitement of positive country conditions are that there were no arbitrary or politically motivated killings and that there were no long-term detainees. But this evidence is not individualized to Mr. Maharaj because he was a short-term detainee on repeated occasions, and he was not only concerned about political problems. He was also concerned with nongovernmental-based problems. And with respect to the due process violation, Your Honor, this will be very brief. We merely would like to point out that in this situation, this was not a – the IJ was not conducting a mere assessment of credibility, but he was inserting his own personal knowledge and speculation, which prevented his full consideration of all of the evidence that was put for him by bias. Thank you very much, Your Honor. Thank you. We thank both counsel for the argument and particularly want to thank our students from Santa Clara Law School for your pro bono service to the Court. Thank you very much. Very good. Thank you. Thank you. Maharaj v. Holder, therefore, is now ordered – submitted for decision. And the next case on the oral argument calendar is Grassy v. Moody's Investor Services.
judges: Beistline, Schroeder, Bybee